THE CUMBERLAND TELEGRAPH AND TELEPHONE CO. *v.*
THE UNITED ELECTRIC RAILWAY CO.

*(Nashville.　March 11, 1894.)*

1. ELECTRIC STREET RAILWAYS.　*Constructed and operated upon streets are not additional burden upon fee.*

An electric street railway, constructed and operated by means of an overhead trolley wire supported by poles, with the permission of the public authorities, for the transportation of passengers only, and conforming its track to the surface of the ground, is not an additional servitude upon the fee within the street, but a legitimate use of the streets within the purpose of their original dedication.　But this principle does not extend to property rights outside the streets, which are subjected to loss or burden by reason of the extraordinary incidents attending the operation of such railways, and which were not contemplated or compensated for in the original dedication of the streets to public use.　(*Post, pp. 502–505.*)

Judges Wilkes.and Bright dissenting.

Cases cited: 2 Am. R. R. & Corp. Cas. (R. I.), 44; 6 Am. R. R. & Corp. Cas., 335; 47 N. J. Eq., 380; 3 Ohio Cir. Ct. R., 425; 85 Mich., 634; 12 L. R. A. (Ohio), 534; 139 Pa. St., 419.

2. SAME.　*Is ordinary use of streets.*

An electric street railway whose lines are constructed and operated in such manner as to constitute a legitimate use of the streets, and to impose no additional burden upon the fee, is an "ordinary use" of the streets, which telephone and other like companies are forbidden to obstruct by the terms of the statute authorizing them to occupy the streets.　(*Post, pp. 502–505.*)

Judges Wilkes and Bright dissenting.

Act construed: Acts 1885, Ch. 66.

3. ELECTRIC STREET RAILWAYS AND TELEPHONE COMPANIES.　*Their status and rights upon the streets.*

The rights of electric street railway companies, and of telephone companies, to construct and operate their lines upon the public streets are, under our statutes, co-ordinate.　Each is independent of the other within its own sphere.　Neither is subservient to the other,

though the sphere of telephone companies is circumscribed by the condition that they shall not obstruct the ordinary use of the streets. Each must exercise its powers with a careful and prudent regard for the other's rights. Both are *quasi* public corporations, deriving their rights and franchises from the same source, and exercising them by the same authority. They are equally indispensable to the public, and should exist under conditions equally favorable to the accomplishment of the purposes of their creation. (*Post, p. 502.*)

Acts construed: Acts 1885, Ch. 66; Acts 1887, Ch. 65; Acts 1889, Ch. 49.

### 4. SAME.   *Conflict of poles and wires.*

An electric street railway company whose lines are constructed and operated in such manner as to constitute an "ordinary use" of the streets, is nevertheless liable to a telephone company for the damages inflicted, where the railway company enters upon a street, one side of which is already occupied by the poles and wires of the telephone company, and, by erecting its poles on both sides of the street, when one side would have sufficed, necessitates the change and removal of the poles and wires of the telephone company. (*Post, pp. 500, 501, 505.*)

### 5. SAME.   *Damages caused by induction or parallelism.*

An electric street railway whose lines, constructed and operated in such manner as to constitute an "ordinary use" of the streets, are parallel to the pre-existing lines on the same streets of a telephone company, both companies using the earth as a return conductor, is not liable for damages inflicted upon the telephone company by those electrical disturbances attending such parallelism, known as "induction." The occupation of the streets by telephone companies is upon condition that they shall not obstruct the "ordinary use" thereof. Liability for consequences of induction obstructs the railway's free use of the streets. The telephone company's damages therefore result from its own wrongful act. (*Post, pp. 499, 500, 505, 506.*)

### 6. SAME.   *Damages caused by conduction or leakage.*

An electric street railway, lawfully constructed upon the streets, and, in its operation, using the earth as a return conductor, according to an approved system, and producing non-natural electric conditions on and beyond the limits of the streets by reason of its collection and discharge into the earth of large and unusual quantities of electricity, must compensate a pre-existing contiguous telephone plant, constructed according to a long used plan, and also using the earth as a return conductor, but causing no disturbance of ordinary electric

conditions anywhere, for damages inflicted upon it by the process known as "conduction" or "leakage," where the telephone exchange is located, and the telephone wires are grounded, on private proper-ties outside the streets, and are there invaded and injured by the ex-cess of electricity thrown off in the operation of the railway. (*Post, pp. 498, 499, 506–526.*)

### 7. SAME. *Same. Expense of putting in "McLeuer Device."*

The "McLeuer Device," a large copper wire, attached at both ends to the outgoing telephone wires, and constituting a return conductor, being the cheapest effective remedy for injury by "conduction," and capable of being applied alone by the telephone company, it is the right and duty of such company to resort to said "Device" for its own protection against loss by "conduction," and it may recover the cost of the same of the railway company. (*Post, pp. 499, 524–526.*)

### 8. TELEPHONE COMPANIES. *Use of streets.*

By the terms of the statute granting telephone companies the use of the streets, they are forbidden to obstruct their "ordinary use" by others. This limitation does not attach, however, to the use of their properties outside the streets. (*Post, pp. 507, 508.*)

Act construed: Acts 1885, Ch. 66.

### 9. SAME. *Rights and franchises not revoked by statutes for benefit of street railways.*

The statute conferring franchises upon telephone companies is not re-pealed by implication by later statutes conferring franchises upon street railway companies. Repeals by implication are not favored. Repugnancy between statutes must be plain and unavoidable, or a later statute will not operate to repeal an earlier one. (*Post, p. 508.*)

Acts construed: Acts 1885, Ch. 66; Acts 1887, Ch. 65; Acts 1889, Ch. 40.

### 10. CORPORATIONS. *Revocation of franchise.*

Although the Legislature has power to revoke the franchises of a foreign corporation, and, since the Constitution of 1870, those also of any domestic corporation, yet this power cannot be exercised in a manner that would operate as a confiscation of the properties of such corpo-rations for the benefit of others. And revocation of such franchises will not be presumed, but must appear by the clearest expression of the legislative intent, especially where corporations have made large investments upon the faith of these grants. (*Post, pp. 508, 509.*)

Telegraph and Telephone Co. *v.* Electric Railway Co.

11. EMINENT DOMAIN. *What is a taking of property.*

The injury by "conduction" is a taking of the property of the telephone company by the street railway company, within the constitutional provision requiring compensation to be made for private property taken for public use. It imposes a burden upon telephone company's property that impairs its use and value. The loss is fixed and definite in amount. It makes no difference that no material thing was taken, or that the loss resulted, not from contact of material things, but through the agency of the subtle and impalpable electric fluid. The important consideration is that a thing of value has been taken from the telephone company for the benefit of the street railway company, as the representative of the public, and for that thing compensation must be made. (*Post, pp. 510–524.*)

12. SAME. *Same.*

Loss by conduction is not to be classed as a mere "inconvenience" or "consequential injury," that must be borne without compensation, as a common burden for the public benefit. (*Post. pp. 522, 523.*)

---

FROM DAVIDSON.

---

Appeal in error from Circuit Court of Davidson County. W. K. McALISTER, J.

VERTREES & VERTREES for Plaintiff.

EAST & FOGG and J. C. BRADFORD for Defendant.

G. W. PICKLE, Sp. J. This is a suit by a telephone company against an electric street railway company to recover damages inflicted upon the telephone plant by the contiguous railway plant. The plaintiff has appealed from an adverse judgment and assigned errors.

The facts are practically undisputed, and, so far as they are material or pertinent to the questions to be determined, are as follows: The plaintiff, a Kentucky corporation, had, prior to 1889, established, in the city of Nashville, a telephone plant upon the "single wire" plan or system. The earth, under this system, is used as the return conductor to complete the electrical circuit, and the overhead "single wire" must have earth connections at both ends, at the "exchange" and at the subscriber's. These earth connections of plaintiff's wires were effected upon private property at both ends, upon the company's property at the "exchange," and upon the subscriber's property, by his consent, at the other end. The poles, upon which plaintiff's wires were stretched, were planted in the public streets by permission of the City Council, and by authority of a general statute of this State which empowers telephone and other like companies, both foreign and domestic, to construct, operate, and maintain, upon consideration of certain benefits conceded to the State and general government, their lines "along and over the public highways and streets of the cities and towns of this State; *Provided*, That the ordinary use of such public highways, streets, etc., be not thereby obstructed." Acts 1885, Ch. 66.

In telegraphy, of which telephony is but another form, it has been universal practice for half a century to use the earth as the "return circuit."

The plaintiff's plant was constructed in accordance

with an approved system, and the one chiefly used in all the large cities of the United States.

The electric currents required and used in the operation of plaintiff's plant cause no hurtful disturbance anywhere of natural electric conditions.

The plaintiff's plant, thus constructed, was in perfect condition and successful operation, rendering satisfactory service to its patrons, when, in 1889, the defendant, a domestic corporation, having obtained control of the street railways of Nashville, which had, with one unimportant exception, been operated by horse power, constructed and put into operation thereon a "single trolley" overhead electric railway system.

Defendant's action in this particular was authorized by general public statutes of the State, which provided that street railway companies that had hitherto used animal power for the operation of their cars, might, with consent of the city authorities, adopt electricity as a motive power. Acts 1887, Ch. 65; 1889, Ch. 40. The required consent of the city authorities was obtained by defendant.

While there are two systems of electric street railways, the "single trolley" system and the "double trolley" system, the former is the more approved and satisfactory, and the one in general use. It is better adapted, than the "double trolley" system, to single track railways like defendant's. It is likewise cheaper.

The defendant's plant was properly constructed

and equipped according to the "single trolley" system.

. The earth is used as a "return circuit" in the operation of street railways constructed upon the "single trolley" plan, but not for those operated upon the "double trolley" plan.

The defendant, in the operation of its plant, generates or collects electricity in such unusual quantities, and applies and uses it in such violent, turbulent, and varying currents, as to produce a non-natural and disturbed condition electrically, not only within the streets, but for the distance of half a mile on either side.

The plaintiff's entire plant was, for a time, paralyzed, and its utility destroyed, by the construction and operation of defendant's plant or system. The injuries, so fatal to plaintiff's franchise and plant, resulted by several methods that it is important to describe.

*First.*—Injury resulting from what is known as conduction or leakage. Currents of electricity of great strength and force are generated and applied by defendant in the propulsion of its cars. These abnormal currents of the electrical fluid are poured out or permitted to escape into the streets. They overflow the streets and invade private property for half a mile on either side, and, finding the earth connections of the telephone wires at the exchange and at the subscriber's, pass up into those wires and the telephone instruments, and, by reason of their great force and volume, substantially

destroy the utility of the telephone plant. This interference can be obviated in only one way—viz., by a metallic "return circuit" for one of the plants. The only metallic "return circuit" for a railway yet discovered is that known as the "double trolley" system. The "double trolley" system is more expensive than the "single trolley" system, and ·inferior in other respects for the operation of single-track railways.

A recent invention, known as the "McLeuer Device," has been proved by experience to be an effective remedy for the disturbances caused by conduction. This "McLeuer Device" consists of a large copper wire, supported on poles, with which the outgoing telephone wires are connected at both ends, and which serves as a "return circuit" instead of the earth. The "McLeuer Device" is the most effective and least expensive remedy that has been discovered for the disturbances caused by conduction. The plaintiff was compelled, in order to reclaim its plant, to put in this "McLeuer Device," at a cost of $3,660.58.

*Second.*—Injury resulting from what is called induction or parallelism. The wires of the telephone company and of the railway company are parallel upon some of the streets.

It is a physical fact of much importance in electrical mechanism that, when two wires of two circuits are parallel to each other, and there is a current of varying intensity on one of them, this will produce in the other, in the opposite direc

tion, a current of electricity of similar variation. The amount of induction depends upon variation in current, the distance of the wires from each other, and the length of the parallelism of the wires. The current upon the trolley wire and the feed wire of the railway is quite variable in quantity and intensity, owing to the drain upon the store of the electricity by the moving and stopping of the car. Nor is the electricity, as generated, exactly uniform in its flow from the dynamo. The result is, wherever the telephone wire is parallel with the trolley wire and feed wire, there is induced upon the telephone wire a current whose variation corresponds with the variations of the electrical current on the electric railway wires, thereby producing such disturbances as render the use of the telephone plant impracticable. But one practicable remedy has been discovered for the disturbances caused by induction; that is, to destroy the parallelism of the wires of the two circuits. This remedy is practicable for the telephone company alone. The expense incurred by plaintiff on this account was $856.30.

*Third.*—The plaintiff expended $816 in putting up higher poles on Main Street, in consequence of conflict produced by the erection of defendant's poles and wires. The plaintiff's poles occupied one side of Main Street, and defendant's poles were put up on both sides of said street, and conflicted with plaintiff's poles and wires so as to

render it necessary for plaintiff to put in new and higher poles.

The majority of the Court think the defendant could have reasonably avoided this conflict by supporting its wires upon a single line of poles, with arms, erected through the middle of the street, or upon the opposite side from the telephone poles and wires. Judge Snodgrass and the writer of this opinion do not concur in this finding of fact.

The contention of the parties will be stated and disposed of in order, and so much of the Court's charge as may be deemed material will be stated in the proper connections.

The fact that plaintiff sustained loss in consequence of the construction and operation of defendant's plant is admitted by defendant. The amount of that loss is accurately ascertained, and is not a matter of controversy. The sole question for determination is defendant's liability for that loss. The loss by conduction is distinct from that resulting from induction, and from conflict of the poles and wires of the two systems. The two items last named, loss by induction and by conflict of poles and wires, may be conveniently considered together as involving the same or similar questions. But loss by conduction will be considered apart from other matters.

*First.*—Is defendant liable for loss that plaintiff sustained from induction and from conflict of the poles and wires of the two systems? This loss,

unlike that caused by conduction, occurs upon and within the streets, and is a direct and immediate result of plaintiff's occupation and use of the streets simultaneously with defendant.

It is important to ascertain the exact status and relative rights of these companies as regards their use and occupation of the public streets. Both are *quasi* public corporations of the same general character. Both serve important public ends and needs, and are equal candidates for public favor. Both derive their rights and franchises from the same source—a public general statute—and exercise them by permission of the same city authorities. The Legislature intended that both should continue to exist under conditions favorable to the accomplishment of the purposes of their creation. No purpose to sacrifice one for the benefit of the other is apparent. It is therefore not quite accurate to say that defendant has the dominant, and plaintiff a subservient, use of the streets. Their respective rights to occupy and use the streets are co-ordinate. Each, within its own sphere, is independent of the other. The defendant's right is to use the streets for the erection and operation of an electric railway. Acts 1887, Ch. 65; Acts 1889, Ch. 40. And this, it is insisted, is a strictly legitimate and ordinary street use. The plaintiff's right is to use the streets incidentally in the erection and operation of a telephone plant, with the proviso that the ordinary use of the streets be not thereby obstructed.

It is perfectly clear that no conflict can occur between these companies in the use of the public streets, if each shall remain within its proper sphere and exercise its powers with that careful and prudent regard for the rights of the other which the law enjoins. The defendant must exercise care and prudence to avoid injury to plaintiff, and plaintiff must not obstruct defendant's use of the streets, if that be an "ordinary use." Is an electric street railway an ordinary use of the streets? There can be no substantial distinction between an ordinary and a strictly legitimate use of the streets.

With rare unanimity the Courts have concurred in holding that an electric street railway, constructed and operated upon the streets by means of an overhead trolley wire supported by poles, with permission of the public authorities, for the transportation of passengers only, and conforming its track to the surface of the ground, is not an additional servitude upon the fee within the streets, but a legitimate use of the streets within the original general purpose of their dedication. 2 Am. R. R. & Corp. Cas. (R. I.), 44; 47 N. J. Eq., 380; 3 Ohio Cir. Ct. R., 425; 85 Mich., 634; 12 L. R. A. (Ohio), 534; 139 Pa. St., 419; 6 Am. R. R. & Corp. Cas., 335. Streets were designed to afford facilities for the inter-communication of the multitudes of people assembled within cities and towns. New and improved methods of travel, devised to meet the growing demands of increased population and sub-

urban life, are within the original general purpose for which streets were created.

Electric street railways, constructed and operated as stated, are but a modern and improved use of the streets as public ways, affording, without considerable public inconvenience or obstruction of other proper use of the streets, the facilities for cheap, rapid, reliable, and convenient transportation, so essential to the population of large cities and their suburban additions. The growth and extension of cities must have been contemplated when the streets were established. Such use of the streets, whether new or old, as would best accommodate the increased population must have been likewise contemplated. That the electric railways use the streets only by statutory permission or regulation, cannot affect the question, as the Legislature may undoubtedly regulate the ordinary use of streets. The objections urged against the electric railway would exclude the horse car and the cable car; and the result would be to magnify the abutter's insignificant interest in the fee into an importance and value never contemplated by either party, and to subject the public to the burden and inconvenience of making new condemnations of the fee upon the introduction of any new and improved method of using the streets. We hold the electric street railway a legitimate use of the street, within the original general purpose of dedication, and therefore an ordinary use. This seems to have been the common understanding hitherto of the

Legislature, the street railway companies, the general public, and the legal profession. We do not hold, and must not be understood as holding, that the electric railway companies may, without making compensation, accompany such ordinary use of the streets with such extraordinary incidents as impose new or additional burdens upon properties outside the streets that were not, and could not have been, contemplated and compensated for in the original taking. The differences between a dummy line and an electric street railway are so palpable as to require no enumeration. Judges Wilkes and Bright do not concur in the conclusion that electric street railways are an ordinary use of the streets.

By whose negligence or fault has plaintiff sustained the loss under consideration? Clearly, upon the facts as found by the majority, the loss caused by conflict of poles and wires is imputable to defendant's fault or want of care. Having power to have avoided this conflict without injury to its plant, it was defendant's duty to do so. The conflict was the result of defendant's unnecessary act. On the other hand, the loss by induction cannot be imputed to any fault or negligence of defendant. Its plant was, as regards this matter, properly constructed and operated. Defendant could not obviate induction without abandoning the streets where it occurred. Induction is such obstruction of the streets as plaintiff is forbidden to create.

The objection that induction is not an obstruc-

tion of the streets "sticks in the bark." True, it did not arrest the construction and operation of defendant's plant, but that results not for the reason that induction is not an obstruction, but because defendant was sufficiently powerful to disregard and override it.

A child upon defendant's track, in front of its moving car, is not, in a strict sense, an obstruction, but who will say that the fact does not seriously interfere with defendant's free and unembarrassed use of the street. The constraint caused by liability for legal penalties, if the child is crushed, operates as a very substantial obstruction. Defendant must stop the car or incur serious liability. It is in vain to say that induction is not an obstruction, if defendant shall be held for the unavoidable damage caused by it. It is true, induction implies no physical contact of the two plants, but it is a direct and immediate result of plaintiff's use and occupation of the streets. The presence and position of plaintiff's poles and wires upon the streets cause induction, and their removal would obviate it. The plaintiff cannot recover for the loss sustained from induction. It results from his unlawful obstruction of defendant's use of the streets. The consideration of other questions is irrelevant in this connection.

*Second.*—Is defendant liable for loss sustained by plaintiff from the effects of conduction? The loss by conduction, unlike that caused by induction, does not result from plaintiff's obstruction of de-

fendant's use of the streets for an ordinary purpose. This interference would occur, and cause precisely the same loss to plaintiff, and in precisely the same manner, if plaintiff had no poles or wires upon the streets. Loss by conduction does not result in the slightest degree from the presence of plaintiff's poles and wires upon the streets, and would not be, to any extent, remedied by their removal. The contact between the two plants caused by conduction, and the consequent injury, do not occur upon or within the streets or through the medium of plaintiff's poles and wires located upon the streets, but upon plaintiff's private property, and that of its subscribers, lying outside of the streets and within half a mile on either side.

The fact of plaintiff's occupation and use of the streets, a controlling factor in determining defendant's liability for loss by induction, is irrelevant in the consideration of the question of defendant's liability for loss by conduction. This question must be determined as if plaintiff had no poles or wires upon the streets.

The proviso in the statute of 1885, forbidding plaintiff, by its use of the streets, to obstruct their ordinary use, has no application to the question under consideration. That proviso limits plaintiff's use of the streets, but it does not abridge its right to private property outside the streets, and wholly detached from their use. That statute confers upon plaintiff the use of the streets, and limits that use. It does not confer upon plaintiff any

rights of private property outside the streets, and does not undertake to abridge any such rights. The proviso pertains wholly and exclusively to the use of the streets.

The defendant's claim to the dominant use of the streets, if conceded, has no place in the consideration of this question involving the rights of the parties outside the streets.

Another contention of a kindred nature, made on behalf of defendant, may be conveniently disposed of in this connection. It is insisted that plaintiff's corporate franchise was revoked or modified as an effect of the legislation permitting street railway companies to use electricity in the propulsion of their cars, at least, so far as to render it subordinate to defendant's junior franchise.

To state it in another form, the insistence is that the Act of 1885, for the benefit of telephone companies, has been repealed or modified by implication by the Acts of 1887 and 1889, for benefit of electric street railway companies. Repeals of statutes by implication are not favored. Repugnancy between statutes must be plain and unavoidable, or a later statute will not operate to repeal an earlier one by implication.

Again, no intention on the part of the Legislature to abridge the granted rights of one corporation by a new grant to another will be recognized by the courts, unless such intention plainly appears in the law. And especially should this rule prevail when both corporations are, as in this

case, useful public servants, equally indispensable to public convenience, and the one enjoying the older grant has acquired property and expended money upon the faith of it which would be destroyed by the revocation of its franchise. It may be conceded that, under our Constitution of 1870, corporate franchises are revocable at the will of the Legislature. The Legislature has undoubted power to exclude a foreign corporation from the State. In neither instance would the corporation have just cause to complain. But this power does not extend to the confiscation of the property of the corporation thus denied the exercise of its franchise. But, in the case under consideration, the plaintiff's rights and franchise have not been abridged or revoked by any subsequent legislation in favor of street railway companies. Had a result so extraordinary been intended as the revocation, without compensation, of the telephone franchises for the benefit of the street railways, it would have found expression by positive enactment. It cannot be admitted by implication upon this record.

There is no necessary conflict between the rights and franchises of these companies. There is not any unavoidable repugnancy between the statutes upon which they respectively rely. The electric railway plant can be operated, under proper limitations as to distance and apparatus, without causing injury to telephone plants by conduction. This fulfills defendant's grant without trenching upon the pre-existing rights of plaintiff. If defendant

seeks to have a more beneficial use of its plant by an invasion or use of plaintiff's property, it is just that compensation should be made.

Our conclusion is that plaintiff's rights have not been abridged or revoked by the Acts of 1887 and 1889, but remain precisely as they were before the passage of these statutes. It should be observed, in this connection, that the injury caused by conduction is not such necessary incident to the ordinary use of the streets as to have been contemplated and compensated for in the original taking for street uses. It is not necessarily, or even ordinarily, inflicted upon abutters, but extends to many properties, on either side, that have not been taken or subjected to any burden for street uses.

This brings us to the consideration of a novel and very important question. It is insisted by defendant that plaintiff cannot recover the damages caused by conduction, except upon the theory that it has the right to the exclusive use of the whole earth for electric purposes. A monopoly of the earth's use for any purpose, or by any person, is, of course, inadmissible. The plaintiff, however, repudiates this ambitious and extravagant claim, and insists that its demand is the more modest and reasonable one for the exclusive use of electricity upon its own premises, in an authorized and non-hurtful manner, without injurious disturbance from non-natural electric conditions caused by the defendant's acts.

To recall the pertinent facts: The plaintiff had,

Telegraph and Telephone Co. *v.* Electric Railway Co.

by public authority and permission, erected and equipped its telephone plant upon an approved plan, and put it into successful operation, grounding its wires upon the property of itself and subscribers, and using the earth as a "return circuit," in accordance with the universal practice of half a century in like enterprises. Afterwards, defendant, by like permission, began the operation of a "single trolley" electric railway plant, using the earth as its "return circuit." The defendant's plant was placed in such proximity to plaintiff's pre-existing plant as to cause injury to the latter by conduction. The operation of plaintiff's plant caused no injurious disturbance of natural electric conditions anywhere.

In the operation of defendant's plant large and turbulent artificial currents of the electrical fluid were generated and poured into the streets beyond defendant's control. These currents, following a natural law, left the streets and overflowed private property for half a mile on either side. It was upon the private property of plaintiff and its subscribers, and not elsewhere, that these abnormal electric currents found and ascended plaintiff's ground wires and throttled its plant. The injury by conduction can be obviated at an expense which entails no great hardship upon either party.

We think, upon these facts, that plaintiff has the right to the protection of the Courts in the enjoyment of its property. Franchises, easements, and the ability to use property, though intangible,

have value, and are, equally with tangible property, entitled to the recognition and protection of the Courts. If plaintiff's claim, that contemplates no more than a lawful and non-hurtful use of its own property, shall be characterized as a demand for the monopoly of the whole earth, what shall be said of defendant's larger demand for a hurtful use not only of the streets, but of private property for half a mile on either side? The plaintiff's request is: "Let me alone in that use or application of electricity upon my own premises, that causes no harm or disturbance to any one anywhere." The defendant's command is: "Get out of my way!" to all feebler electrical enterprises that may have the misfortune to come within the range of its power.

The plaintiff proposes an adjustment of conflicting claims with defendant by the rule embodied in the enlightened maxim, *sic utere*, etc., while defendant insists upon the application of that ruder maxim, "might makes right." If defendant could succeed in its contention, there can be little doubt that the unjust rule thus established would some day "return to plague the inventor." What protection has this defendant in the enjoyment of its vast properties, if it can be deprived of the power to operate them by some younger, but more robust, child of invention that shall hereafter obtain mastery in the electric world? Is not the non-injurious use of electricity the only safe and just basis for the adjustment of the conflicting claims

of electrical inventions and enterprises? What different basis than this can be arbitrarily established? Where shall the line be drawn between those electrical enterprises that must take care of the artificial currents of electricity generated by them, and those that shall not be required to do so?

To concede defendant's claim is to give to it a hurtful use of plaintiff's property, and at the same time to deny plaintiff the harmless use of its own. The argument that assumes that plaintiff is claiming the whole earth as a return circuit, and therefore appropriating a common right to its exclusive use, because "plaintiff's portion of the earth cannot be isolated and separated electrically from the balance of the earth," is one which, if pressed to its logical results, would work a revolution in the law as to the use of the earth, the water, and the air. How, if this argument be sound, can any one insist that the air and water, that, by the operation of natural law, visits his premises and supports life, shall not be rendered noisome and impure by the injurious acts of his neighbor? It is impossible that his portion of the air or water can, in advance, be "isolated and separated from the balance." Is not the right to the use of air and water as "common" as that to use electricity? If the right to the non-hurtful use upon one's own premises, without injurious disturbance from others, of air or water or electricity, is made to depend upon his ability to isolate and separate, in advance, his portion of these

33—9 ᴘ

elements from the "balance," that right resolves itself into an "airy nothing."

The suggestion that plaintiff, in using the earth as its "return circuit," appropriates and uses electrically the properties intervening between its "exchange" and its subscribers' stations in any other than a lawful manner, is, as we think, based upon a misconception.

The plaintiff's use of electricity causes no disturbance electrically upon these intervening properties or elsewhere, and affords no inducing cause, there or elsewhere, for the invasion of its property by defendant's artificial electrical currents.

The plaintiff uses the intervening or other outside properties for electrical purposes in no other sense than it uses abutting lands as a part of the frame-work of the earth to support its own; or uses the channel of the stream upon adjoining lands that conveys the water, by natural flow, to its own; or uses the law of gravitation that causes the water to flow toward its land instead of in an opposite direction. The plaintiff does not assert the right to an injurious use of electricity, even upon its own premises.

The doctrine that reason sanctions and justice approves, as it appears to us, is that the lawful, harmless, and accustomed use upon one's land, alike of water, air, or electricity, cannot be lawfully obstructed or impaired by the injurious act of another, attended with such disturbance of natural and existing conditions, and consequent

loss, as that caused by conduction in this case, especially when the party performing the injurious act, had the power to obviate and remedy the injury or loss, without greater sacrifice, comparatively, than is required of defendant in this case to remedy conduction.

It is not material that the injurious act is done upon the premises of one other than the injured party—as, if the channel of a stream is cut upon adjoining lands, and the water diverted, or the waters are there arrested in their regular flow and then turned loose in flooding quantities.

To sustain plaintiff's claim accords with the analogies of the law, as will appear from the following cases:

A manufacturer of cocoa matting used a delicate chemical to bleach his matting, which was then hung out on his own land in the air to dry. Another manufacturer made sulphate of ammonia, and the vapors escaping in the air combined with the bleacher's chemicals and blacked his mats. It was shown that if the cocoa mat-maker had used another chemical just as good, or better, his mats would not have been affected. But it was held that he had the right to use any chemical he pleased which would not hurt anybody else, and that he had the right to have the air come to his lands pure and untainted. *Cooke* v. *Forbes*, L. R., 5 Eq. Cas., 166.

A manufacturer discharged the refuse from his works into a surface stream. It corroded the

boilers of another factory below, which used water from the stream for steam purposes. The upper manufacturer was enjoined. *Merrifield* v. *Lombard*, 13 Allen, 16 (S. C., 90 Am. Dec., 172).

A manufactory of copper in one case, and of lead in another, gave off vapors, which were carried by the winds upon the lands of another, and injured growing crops, fruit trees, and flowers. They had to close down. *St. Helen's Smelting Co.* v. *Tipping*, 11 House of Lords Cas., 642; App. of Penn. Land Co., 96 Penn. St., 116 (S. C., 42 Am. Rep., 534).

A brewer bored a deep well and got water for use in making his ale. There was no running stream below. His neighbor had a similar well, but used it as a sink. The sewerage percolated the brewer's lands, and polluted the water so it could not be used in making ale. The brewer was protected in the use of his well. *Ballard* v. *Tomlinson*, L. R., 29 Ch. Div., 115 (S. C., 24 Am. Law Reg., 634).

The Standard Oil Company stored oil in its warehouse. The oil barrels leaked. This leakage, soaking into the earth, percolated Mr. Kinnaird's land, and ruined his spring. It was held the company had no right to thus use its property. *Kinnaird* v. *Standard Oil Co.*, 89 Ky. · (S. C., 25 Am. St., 545).

A silk-maker required water of great softness and purity to wash and dye his silks. He got it out of the "Charnot." A public water company

built a reservoir above, and so collected the water that when it was discharged, the purity of the water was affected. The company had to quit. *Clines* v. *Staffordshire, etc., Co.*, L. R., 8 Ch. App. Cas., 126; Gould on Waters, Sec. 219; *Acquaenock Water Co.* v. *Watson*, 29 N. J. Eq., 372.

Although the precise, question determined in this case has not hitherto been necessarily involved in the decision of any case, it has, nevertheless, been considered by some of the Courts.

In *Hudson River Tel. Co.* v. *Watervliet T. & R. R. Co.*, 52 N. E. Rep., decided in 1892, the Court of Appeals of the State of New York expressed its views as follows:

"The defendant insists that it has an equal right with plaintiff to make use of this property, or law of nature, in the conduct of its business, just as all are entitled to the common use of the air and the light of the heavens, which, in a certain sense, is undoubtedly true. But the defendant does something more. It does not leave the natural forces of matter free to act, unaffected by any interferences on its part. It generates and accumulates electricity in large and turbulent quantities, and then allows it to escape upon the premises occupied by the plaintiff, to its damage.

"We are not prepared to hold that a person, even in the prosecution of a lawful trade or business upon its own land, can gather there, by artificial means, a natural element like electricity, and discharge it in such volume that, owing to the

conductive properties of the earth, it will be conveyed upon the grounds of his neighbor with such force and to such an extent as to break up his business or impair the value of his property, and not be held responsible for the resulting injury. The possibilities of the manifold industrial and commercial uses to which electricity may eventually be adapted, and which are even now foreshadowed by the achievements of science, are so great as to lead us to hesitate before declaring an exemption from liability in such a case. It is difficult to see how responsibility is diminished or avoided because the actor is aided in the accomplishment of the result by a natural law. It is not the operation of the law to which plaintiff objects, but the projection upon its premises, by unnatural and artificial causes, of an electric current in such a manner, and with such intensity, as to materially injure its property. It cannot be questioned that one has the right to accumulate water upon his own real property, and use it for a motive-power; but he cannot discharge it there in such quantities that, by the action of physical forces, it will inundate his neighbor's lands and destroy his property, and shield himself from liability by the plea that it was not his act but an inexorable law of nature that caused the damage. Except where the franchise is to be exercised for the benefit of the public, the corporate character of the aggressor can make no difference. The legislative authority is required to enable it to do

business in its corporate form; but such authority carries with it no lawful right to do an act which would be a trespass if done by a private person conducting a like business. If either collects, for pleasure or profit, the subtle and impalpable electric fluid, there would seem to be no great hardship in imposing upon it, or him, the same duty which is exacted of the owner of the accumulated water-power—that of providing artificial conduit for the artificial product, if necessary, to prevent injury to others."

The opinion of the Supreme Court of New York was to the same effect.

An English Judge, in a recent case, has thus stated his views:

"But, after reflecting much on the merits of the case, on the argument addressed to me, and on the peculiarity of an electric current as distinguished from every other power, I fail to see any reason why the principle should not be applied to it. I cannot see my way to hold that a man who has created—or, if that be inaccurate, called into special existence—an electric current for his own purposes, and who discharges it into the earth beyond his control, is not as responsible for damages which that current does to his neighbor as he would have been if, instead, he had discharged a stream of water. The electric current may be more erratic than water, and it may be more difficult to calculate or to control its direction or force, but, when once it is established

that the particular current is the creation of, or owes its special existence to, the defendant, and is discharged by him, I hold that if it finds its way onto his neighbor's land, and there damages the neighbor, the latter has a cause of action." *Nat. Tel. Co.* v. *Baker*, L. R. (1893), 2 Ch., 186.

The same doctrine was maintained by Judge Taft, then Judge of the Superior Court of Cincinnati, and now a Justice of the Federal Circuit Court of Appeals, in the case of the *City and Suburban Tel. Ass.* v. *The Cincinnati Inclined Plane Railway Company*.

The injury by conduction constitutes such invasion or taking of plaintiff's property as renders defendant liable for the damage done. It is a direct and immediate result of defendant's injurious act. It imposes a burden upon plaintiff's property that impairs its use and value. The loss is fixed and definite in amount. It can make no difference that no material thing was taken, or that the loss resulted, not from contact of material things, but through the agency of the subtle and impalpable electric fluid.

The important consideration is that a thing of value has been taken from plaintiff for the benefit of defendant as the representative of the public, and for that thing compensation must be made. It is a plain dictate of justice that the public, not the individual citizen, should bear the burdens imposed upon private property for the public benefit. That defendant's act may have been author-

ized and lawful can make no difference. The Legislature has not the power (except, perhaps, as to corporate franchises) to authorize, and in this case it has not undertaken to authorize, the taking of private property for a public use without compensation.

Says Mr. Taylor on Corporations: "To constitute a taking of property, it is not necessary that any *material* thing be actually taken; it is enough if any *right* of the owner respecting the thing owned be impaired, so that he cannot apply the thing to all the uses of which it was formerly capable. The Legislature cannot authorize either a direct or a consequential taking or *injury* to property without compensation; and if a corporation voluntarily, for its own benefit, so constructs a work as necessarily to injure the property (*i. e.*, the thing owned) of an individual, or deprive him of any right he may possess regarding the thing which he owns, or his rights therein, it will be bound to compensate him for his damages, even though the work be properly and lawfully constructed." Taylor on Corp., Secs. 173, 473, and numerous cases cited.

Mr. Lewis, in his late exhaustive work on Eminent Domain, sums up the doctrine in these words: "What possible distinction can there be between the actual taking of my property, or a part of it, and occupying it for the erection of a railroad track, or a gas-house, and *invading* it by an *agency* that *operates* as an actual abridgment

of its beneficial use, and possibly a complete and practical ouster? (Sec. 152.)

"An Act which authorizes a particular business at a particular place, which necessarily defiled the air so as to create a nuisance, would be void, and unless it was for public use—such as manufacturing gas for a city—would be subject to the constitutional limitation of making compensation." Lewis on Emi. Dom., Sec. 152; and see *Ib.*, Secs. 149, 55, 57.

Says Mr. Wood, in his work on Nuisances:

"Wherever the exercise of the right (asserted) operates to destroy an *easement* incident to real property or *amounts* to an actual physical invasion, of property by some *agency* that produces injury thereto, or imposes a *burden* thereon, this is a taking of property." Sec. 762.

And, further: "The Legislature cannot confer upon a corporation the right to do any act that imposes a burden upon the property of others, that amounts to an actual taking of property for public purposes, so as to exempt such corporation from liability for all damages that result from the exercise of their franchise, that, in law, amounts to a taking of property." Wood on Nuisance, Sec. 759. See, also, *Gay* v. *Knoxville*, 85 Tenn., 92; *Street Ry. Co.* v. *Doyle*, 88 Tenn., 747; *Myers* v. *St. Louis*, 82 Mo., 378; *Abendarth* v. *Manhattan Ry.* (N. Y.), 19 Am. St. Rep., 461.

The injury by conduction does not belong to that class of "consequential injuries" or "incon-

veniences" which, it is said, must be borne in ordinary cases without compensation, as the penalty and price of living in cities and enjoying the conveniences and comforts of civilized life. These are usually of such character as to affect the community generally, and are, therefore, in a sense, borne by the public. The damages thereby inflicted are, moreover, not of easy and satisfactory computation.

Here the injury is the direct result of an injurious act, and of a graver character than a mere inconvenience. It affects a single person seriously, and the community only incidentally. The loss inflicted is definite in amount.

We respectfully dissent from the view expressed by Judge Brown, in the injunction case between these companies, where he classes this injury with the inconveniences that result from "the smoke that fills our lungs and soils our garments; the dust that enters our dwellings and stores and damages our furniture; the noxious odors that assault our nostrils; the impure water we are sometimes compelled to drink," which, he says, "are the necessary penalties we pay for living in cities, but in ordinary cases there is no legal remedy for the evil." 42 Fed. Rep. This is not, in our opinion, an ordinary case, in which compensation should be denied, even if it is classed as an "inconvenience" or "consequential injury."

It has been suggested that the electric railway companies may be subjected to multiplicity of suits

under this decision. That may be inconvenient and expensive for the railway companies, but it constitutes no defense to their liability for the value of private property taken for their use. Besides, the inconvenience is not all on one side. It might prove equally inconvenient for the citizen to have his right to maintain a telephone at his home or place of business placed at the mercy of the electric railway companies.

One question remains: Was it plaintiff's legal duty, upon the institution of defendant's electric system, to protect itself against the injurious consequences by making, at its own ultimate cost, such changes in its pre-existing plant as would obviate the effects of conduction—*e. g.*, by putting in the "McLeuer Device?"

We answer this question in the negative. The defendant must take care of the natural and reasonable consequences of its own act. The plaintiff, being in the lawful possession and enjoyment of its own property, was under no obligation to take notice of defendant's approach, or to get out of its path.

Judge Brown says, in his opinion in the injunction case: "If, in the case under consideration, it were shown that the double trolley would obviate the injury to complainant without exposing the defendants or the public to any great inconvenience or a large expense, we think it would be their duty to make use of it, and should have no doubt of our power to aid the complainant by an injunction."

This is correct as regards the application for an injunction, but, if it is to be understood as holding that defendant would not be liable for the loss by conduction if plaintiff could apply the cheaper remedy, then we dissent from the view expressed. The plaintiff can only recover such loss as necessarily resulted to it from defendant's act. It must use due diligence to prevent unnecessary loss. The fact that plaintiff could apply the cheaper remedy would affect the amount of its recovery, but not the fact of defendant's liability. The right of the owner to compensation for his property taken for public use does not depend upon any consideration of this sort.

We have been referred to some cases that maintain views in apparent conflict with those expressed herein. It is sufficient to say of these cases that the New York and Ohio cases were decided chiefly upon consideration of particular statutes. *Railway Co.* v. *Tel. Ass.*, 48 N. Y., 390. They were, without exception, injunction cases, in which the telephone companies appeared at great disadvantage, as seeking to obstruct the path of progress, and to debar the public of a great convenience. In that contest, the telephone companies sought to take the lives of the electric railway companies. Here the question is one of liability for a sum that would impose no serious hardship upon either party to bear. In none of the cases was the question here decided necessarily involved. It was discussed, however, by some of the Courts. It

was perfectly clear in the injunction cases that the telephone companies were not threatened with irreparable injury. They had an adequate remedy by suit at law for damages. On the other hand, to have enjoined the railway companies would have inflicted irreparable injury upon them and the public.

As the result upon the whole case, the judgment below is affirmed as to the loss by induction, and reversed in all other respects. And upon the written stipulation of the parties that final judgment shall be entered here, there will be entered in this Court judgment in favor of plaintiff and against defendant for $3,660.58 for loss by conduction, and $816 for loss by conflict of poles and wires, with interest from date when expended, and all costs of this cause.

Judge Caldwell concurs in the result of this opinion on the question of conflict of poles and wires, and on the question of induction, but does not agree on the question of conduction.

---

### DISSENTING OPINION.

WILKES, J. I concur in the opinion of the majority as to the liability of the electric railway company for damages for the interference of the poles and wires of the railroad company with those of the telephone company, on Main Street, East

Nashville, upon the ground upon which it is placed by the majority; I also concur with the majority as to the liability of the railroad company for all damages caused by conduction, and think the conclusion can properly be arrived at upon the grounds taken by the majority; but I am unable to concur with the majority that the use of the streets by an electric railway company is an ordinary use of the streets in the sense of the statute and charter provisions. The use of a street, in its broad sense, is the purpose or object of the street. This is simply to furnish a highway or passage-way from one portion of the city to another, and from one man's premises to another. But this highway may be used for this purpose in many different modes. It may be used by foot-passengers, by horses, by carriages, by wagons, or by street-cars drawn by animal power. These are all ordinary or common uses, and have been from time immemorial. What is, then, the ordinary or legitimate use of the street? We would say, in the words of Mr. Lewis, in 6 Am. R. R. & Corp. Repts., page 326:

"*First.*—The right of passage; the right of each member of the community to use the street for travel on foot, with animals, or in vehicles drawn by animals, including the right to such new modes of conveyance as are adapted to the ordinary surface of the highway, and are free to be employed by any member of the community.

"*Second.*—The right to improve the street for

the purpose of facilitating the right of passage, as by grading, paving, draining, lighting, etc.

"*Third.*—The right, sanctioned by long usage and acquiescence and by frequent judicial recognition, to lay sewers, gas-pipes, and water-pipes beneath the surface, for use not only in connection with the right of passage, but also in connection with the abutting property.

"*Fourth.*—The right, possibly, to use the space beneath the surface to a limited extent for pipes or other appliances to distribute any article of convenience or necessity to the occupiers of abutting property, such as steam, petroleum, hot water, electricity, and the like.

"*Fifth.*—The right, upheld by very numerous decisions, of laying down a street railroad so as to correspond with the surface of the street, and to be operated by animal power. Beyond this the authorities do not compel us to go, and reason and justice forbid."

It has been uniformly held, and it is conceded, that an ordinary horse railway is an ordinary use of the streets. It is virtually the same as a carriage or omnibus line, except the simple fact that the street-car is confined to a single track, while other vehicles may pass at will over other parts of the street between the pavements. 2 Dill. on Munic. Corp., 722; 2 Am. R. R. and Corp. Repts., page 55, note. This Court has held that a dummy line is a new use and an additional servitude. *Street Railway Co* v. *Doyle*, 4 Pickle, 751. It has

likewise been held that a cable-car line is an additional servitude. *People* v. *Third Avenue Railway Co.*, 112 N. Y., 396. That an elevated railway is a new use has also been held, and is generally conceded. Thus the law stands as to the several improvements upon the ordinary street railroad.

Now, at the time the electric car system was inaugurated, "an electric street-car was neither usual or common. *It was not even lawful.* Not until several years *after* the telephone was in operation was it lawful to use such power to propel street railways. A net-work of wires; double rows of poles; cross-wires, and long wires charged with dangerous currents of electricity; constant and dazzling flashes beneath the wheels; cars running swiftly, without any visible means of propulsion (the most alarming form of locomotion to horses), and flashing fire all the while; noisy machinery, and all unknown to former ages, and now allowable only by special statute, can hardly be called the usual and common, or 'ordinary,' use of a public street."

I think the practicable test to determine whether the use is a new or an ordinary use, is the character and kind of the motive power used. There are valid and permanent distinctions between different sorts of traffic—between a railroad which conforms to the surface of a street and one which does not, between a railroad with a superstructure and one without a superstructure, between a railroad operated by animal power and one operated

34—9 P

by other power. The march of invention cannot obliterate these distinctions, nor can improvements and variations in railroad construction and operation.

All of these distinctions can be applied to the horse railroad, and it is capable of a logical and permanent distinction from all other railroads. The one particular which distinguishes it from all other railroads is the motive power. Other railroads may be operated upon the same sort of tracks; other railroads may be operated without a superstructure, or may be confined to street passenger traffic, but animal power is animal power for all time, and no other form of power can be confounded with it. In all the early horse railroad decisions, the identity of the motive power with that applied to ordinary vehicles was especially relied upon. The moment this basis of distinction is cast aside, that moment the whole subject is thrown into inextricable confusion. If the steam motor is allowed, then there is no resting place between the smallest motor and the largest locomotive.

While I think the reason of the rule is that the electric car line is a new use and additional servitude, I do not consider that the question is settled to the contrary by the authorities. I recognize the number of authorities cited by the majority opinion. Only two of them are decisions of Courts of last resort (*Cincinnati Inclined Road* v. *Telephone Association*, 12 L. R. A., 534; *Hudson*

*River Tel. Co.* v. *Watervliet Tel. & R. R. Co.*, 52 New Eng. Rep.), and these were upon statutes and charters different from ours, and having peculiar provisions. Moreover, all the cases were applications in equity for an injunction by the telephone company, in which it was necessary to show not only that the telephones were wrongfully interfered with and injured, but also that the remedy at law was inadequate, and the injury not susceptible of being righted by an action at law for damages. The action being brought by the telephone companies, the result was that in most cases the injunctions were refused. But the text-writers agree that the question, as between the telephones and railways, is still open and unsettled, and they incline to the view that the electric car system is a new use and additional servitude. Keasly on Electric Wires, 153; Thompson on Electricity, 64; Booth R. G. Law, Sec., 135; 6 Am. R. R. & Corp. Reps., p. 336; 2 Dillon on Mun. Corp., 892, 2d Ed.; 2 Am. R. R. & Corp. Reps., 57.

In this case, for the first time, the naked question of law is presented, untrammeled by the considerations which applications for injunctions in advance involve. The present case is one *at law*, to recover damages which have been sustained, and the cases cited and relied on by the majority are not conclusive.

Holding to this view, I am of opinion the electric company is liable for all the damages caused to the telephone plant, and the judgment of the

Court below should be reversed, and judgment given here for the several amounts claimed.

I concur in this opinion. A. D. BRIGHT, *Sp. J.*

### DISSENTING OPINION.

SNODGRASS, J. I cannot agree with the majority of the Court as to liability of defendant for injury by conflict of poles on the streets, and my disagreement is based upon the ground that defendant's use of the street, being the dominant use for a proper street purpose, and the city having in fact authorized and directed the erection of the electric railway poles where placed, the telephone company, whose occupation of the street, while a lawful and permissive one, was nevertheless not a street use proper, cannot complain because the poles of the electric railway company were placed on one side of the street when, in fact, they might have been placed on the other. The telephone company can no more complain of this than could any other property holder on that side of the street complain because poles were not located on the other. If so, when such poles are placed in front of buildings constructed on one side of the street, opposite which there are none, the owners of the build-

ings may then rightfully complain that the poles should have been placed on the other side, and in front of the vacant property, a clearly inadmissible claim.

It being clear that the telephone company is on the streets merely by permission, and that their occupancy is subordinate to any street use to which the city might wish to devote the streets, when the city has undertaken to use them for electric railway purposes it cannot be hindered in doing so, nor can the telephone company claim damages for such use authorized and directed by the city. The concession or determination that the electric railroad use is a proper street use is conclusive of that question, and neither the city nor the company can be made by the telephone company to select one side rather than another of the street for placing the poles, or pay damages if it does not do so. On this theory alone, too, is based the other conclusion of the majority that the defendant is not liable for damages caused by induction. If not liable for one, it is not for the other. Properly considered, the two conclusions are necessarily in conflict.

It will not do to say the city can let the electric railway company run its wires parallel with the wires of the telephone company on the streets so as to destroy the use of the latter wires and not be liable, and cannot let it erect street railway poles and wires in contact with them without being liable. The right to permit the erection of

poles includes the right to permit it anywhere the poles can be properly erected, at the discretion of the city. It cannot be made, directly or indirectly, by imposition of penalty in damages on its grantee, to choose a particular side of the street. The railway use being a street use, the telephone company's rights, granted in subserviency thereto, must yield to the claim of the city and its grantee for street service. In this connection it must not be forgotten that though, under the Act of 1885, it was permitted to telephone companies to construct their lines along and over the public highways and streets, it was not intended thereby to recognize such use as a proper roadway or street use, for it was in the same Act provided that this permission was granted upon the condition that the *ordinary* use of such public highways, streets, etc., be not thereby obstructed. It is of course too clear for argument that it is not a *necessity*, for the operation of a telephone line, that it be erected in the streets. It is a convenience to it of course, and the permission it obtained through legislation was a very desirable one, but it did not obtain it upon any theory that it was a street use, nor can any such claim be made for it. With or without the Act, therefore, it is a subordinate use, permissive only for convenience, and must yield to any claim of the public for legitimate street uses, of which the electric railway is one.

On the main point in controversy—the right of damages for injuries inflicted by conduction—I also

disagree with the majority.   The majority opinion is founded, and can be founded, alone on the idea that the complainant has the natural right to the use of the earth as a return circuit, for the complainant does not profess to own the intervening earth between points where its wires on the premises of its several subscribers are buried and its plant.   It is only in consequence of this use of the earth, and its natural right to use it, that the telephone company's intersecting locations at various places are of value.   Disconnect these from the right to use the adjacent earth owned by others than itself, intervening between these points and its "exchange," and it has no valuable property in its buried wires on the premises of subscribers.   So that, in order to deny the defendant the right to use the earth for a return circuit, this very right must be conceded to complainant. And it must logically be conceded that, having first taken possession, it has acquired a monopoly of the earth.

The position destroys itself, for it must, to be true, assume the existence of a right in one which has to be taken for granted in order to disprove that the same right exists in another.   It is no answer to this to say that complainant has a natural current, not disturbing electrical conditions, or a harmless current.   It is not a natural current, but an artificial one, depending for its existence on the generation and specific direction of increased electric fluid, and along an artificial chan-

nel. It is not harmless any more than the other, except that it is not powerful enough to overcome or practically interfere with the other, and in the sense that, in this contact, it produces no obviously injurious results. But it is unnatural, and the hurtful or harmless character, as compared to the other, is different in degree merely, and not in kind, as both are alike artificial and powerful.

No scientist has yet been able to show how or where the injurious contact first occurs. Whether it originates on the land where the wires are buried, or elsewhere on the circuit, and pursues its entire round, is a matter of speculation merely. The hurtful overflow or disturbance may, in fact, originate at a point entirely away from the telephone wire's intersection with the earth, and on land which the telephone company does not claim; but, assuming the contact and disturbance to commence there, then it could not work an injury, unless, in connection with that particular land, the complainant had undertaken to use the earth away from it as a circuit; and so the injury is not to the specific property, but to the circuit of the earth thus sought to be appropriated and monopolized.

Complainant's use of the earth as a return circuit was, of course, on the theory we are treating it, a rightful appropriation by complainant, because that of a property of the earth for such use as is common to all. But it cannot, for that very reason, be an exclusive or monopolistic appropriation. If a right at all, it can only be a natural, common

right, and cannot be asserted against the exercise of a like right which may impair it, because it cannot be exclusive property; for such use of the earth as may be made exclusive by monopolizing can never be recognized as property.

Principles deduced from cases of poisoned air, polluted water, obstructed light, etc., are inapplicable, as drawn from plausible but faulty analogies. These are injuries resulting in specific places to persons having the right to the free and exclusive enjoyment of so much of these elements as are their own or necessary to their own use. But such rights cannot be enlarged, and these cases made applicable to the case of a claim to use the earth for a special benefit from point of contact of a wire (part of an artificial circuit) on one's own property, to any other remote point through lands not so owned, and through which the claimant could acquire right of way only by natural inheritance, in common with all mankind, or by purchase. If the right exists as a natural right, it must be common, and cannot be exclusive. It is not pretended by complainant that it has been acquired by purchase, and, therefore, it does not, as claimed by complainant, exist at all. That complainant's private property is not affected, independently of its claim to the use of the earth as a circuit, is manifest, for no electric fluid could affect such property in the form of land leased or owned by complainant, unless the circuit—the artificial circuit—was established.

The effect of this holding of the majority is to make the railroad company liable for injury to all property within the influence of its escaping electric current, for it is assumed that the value for telephonic use of all property within the influence of this current is impaired. If this be true, it is immaterial whether such property is now being so used or not. The destruction of its capability for such use would necessarily give the right to damages. It must follow, therefore, upon this theory, that all land within the range of the electric influence of defendant's circuit is impaired in value, though not a foot of it has any such value without connecting it with an artificial circuit. This injury, it appears to me, cannot, in fact, result, but it must be held to result on the theory of the majority. The assumption that complainant has the same right to the use of the electric circuit established over adjacent lands, as it has to the support of adjacent land, use of surrounding air, or of water, distantly flowing and finally passing through its property, is obviously fallacious, because all these are natural elements in natural condition, ultimately naturally brought, without artificial means or special appropriation thereby, for complainant's use, but complainant's claim to a special artificial use of the earth throughout that portion claimed by it, as well as by others, if it is a special artificial use, is not helped by reference to natural conditions, under which his right to the enjoyment of natural elements is conceded. For,

if treated as a natural right, complainant's claim to. the earth as a circuit cannot exist to the exclusion or hindrance of an equal natural right in another. The proposition is clear that if it is an artificial right, complainant would have to show his claim to so much of the earth as he uses for a circuit as an owner, before, in any event, it could be exclusive. This he does not pretend to do, and, on this account, his claim must fail. If asserted as a natural right, it must be because it is common and not exclusive. It must fail as such, because, if sustained at all, it must be sustained as exclusive. Complainant has, therefore, no real claim of ownership or superior common right, and, on this ground, his claim for damages should be denied.

I have discussed the questions involved only upon principle, but my conclusions on both propositions are sustained by authority.

The first proposition is directly adjudged by the Courts of last resort in New York and Ohio, and my conclusion as to the second seems to have the approval of the greater number of Courts which have considered it, though not all together in theory.

In the case of the *Hudson River Telephone Co.* v. *The Watervliet Turnpike & R. R. Co.*, decided by the Court of Appeals in 1892, and reversing the decree of the Supreme Court of New York, cited by the majority, it was held that the telephone company's use of the street, being a subor-

dinate one, it could not complain of injuries inflicted by the overflowing electric current of the railway company, because its right was subordinate to that of the railway company. To the same effect is the case of *Cincinnati Inclined Plane Railway Co.* v. *City & Suburban Telephone Association,* decided by the Supreme Court of Ohio, 1891. It is proper to say, too, that the Supreme Court of Ohio, in that case, which reversed his decree therein below, has not adopted the views of Judge Taft, elaborately quoted in the majority opinion in this case; nor do the conclusions of the Supreme Court of Ohio and Court of Appeals of New York, differing from those of Judge Taft and the Supreme Court of New York, depend upon statutes or the form of the action, as might be inferred from the majority opinion. It is true that these cases were injunction cases, as was that also between these same parties to this case, reported in 42 Federal Reporter, cited by the majority, but the questions determined in them adverse to the conclusions of the majority in this case, were not settled, so far as questions we are discussing are concerned, upon construction of statutes, nor dependent upon form of action, and these States, therefore, by decisions of their Courts of last resort, have ranged themselves on the other side of the question than that taken by the majority of this Court. The weight of authority is against the holding of the majority in this case. I have not, however, attached much importance to the

Telegraph and Telephone Co. *v.* Electric Railway Co.

preponderance of decided cases. The question is practically a new one; the cases on it are few, the reasons for each often different from the others, and none absolutely conclusive. I have preferred to rest this dissent upon its own reasoning.