# WASHINGTON RAILWAY & ELECTRIC COMPANY *v.* WASHINGTON TERMINAL COMPANY.

# WASHINGTON RAILWAY & ELECTRIC COMPANY *v.* PHILADELPHIA, BALTIMORE, & WASHINGTON RAILROAD COMPANY.

# PHILADELPHIA, BALTIMORE, & WASHINGTON RAILROAD COMPANY *v.* WASHINGTON RAILWAY & ELECTRIC COMPANY.

---

RAILROADS; STREETS AND HIGHWAYS; NEGLIGENCE; DAMAGES; OBJECTIONS AND EXCEPTIONS; WATERS; NUISANCES.

1. A railroad company which, under statutory authority, has built a tunnel under a public street, is liable in damages to a street railway company which for many years before the construction of the tunnel has operated its line over tracks laid upon such street, for the settling of the earth above the tunnel, resulting in a change of grade

of the street, irrespective of whether the tunnel was negligently constructed or not.   (Following *Philadelphia, B. & W. R. Co.* v. *Karr*, 38 App. D. C. 193.)

2. *Quære*, whether Congress in granting a franchise to a railroad company to construct a tunnel under a public street would have the power to provide that the company should not be liable for damages to property on the surface of the street resulting from such construction.

3. Allegations and offer of proof of negligence on the part of the defendant in an action in which the plaintiff is entitled to recover irrespective of whether the defendant was guilty of negligence will not make proof of negligence necessary.   (Following *Philadelphia, B. & W. R. Co.* v. *Karr, supra.*)

4. An exception based upon a general objection to a modification by the court of a special instruction to the jury asked by the unsuccessful party is insufficient, as the trial court is entitled to be advised of the specific ground of the objection; and this is especially true where there has been a large volume of testimony taken at the trial.   (Following *W. T. Walker Furniture Co.* v. *Dyson*, 32 App. D. C. 90.)

5. A street railway company operating its line of road on tracks laid upon a public street under a franchise from Congress is entitled to recover damages from a steam railroad company which, under a subsequent franchise, has built a tunnel under the street, with the result that the earth has so settled as to change the grade of the street, although such result was caused by the withdrawal of or interference with subterranean or percolating waters beneath the surface of the street; and it is immaterial whether the tunnel was constructed negligently or not.   (Distinguishing *New York Continental Jewell Filtration Co.* v. *Jones*, 37 App. D. C. 511.)

6. He who erects a nuisance continues liable as long as the nuisance continues, and he cannot escape liability by transferring the property constituting the nuisance.

7. In an action by a street railway company whose tracks are along the surface of a public street, against a railroad company for damages resulting from the sinking of the surface of the street caused by the construction by the railroad company of a tunnel beneath the street's surface, the plaintiff's recovery is limited to such damage as it has sustained up to the time of the bringing of the suit.   (Distinguishing *Philadelphia, B. & W. R. Co.* v. *Karr, supra.*)

8. A terminal company charged jointly with a railroad company, by act of Congress, with responsibility for the construction of a tunnel beneath the surface of a public street in a city, which tunnel the terminal company was to operate and control when complete, and which it did so operate and control under a written agreement reciting

that it had participated in the construction and assumed exclusive control thereof, cannot escape liability for damages resulting from such construction by proof that it did not participate therein, but it is equally liable with the railroad company.

Nos. 2825, 2826 and 2827.   Submitted November 3, 1915.   Decided March 6, 1916.

HEARING on cross appeals from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for the sinking of the surface of a public street caused by the construction of a tunnel thereunder.

*Affirmed in part and reversed in part.*

The COURT in the opinion stated the facts as follows:

These appeals grow out of a single action in which the Washington Railway & Electric Company, hereinafter called the plaintiff, sought to recover damages to its tracks, conduits, viaducts, foundations, and supports therefor and used in connection therewith, along First street, East, between East Capitol street and B street, North, resulting from the sinking of the surface of the street, which was claimed to have been occasioned by the construction of the steam railroad tunnel under the west side of that street; or, in other words, by the erection and continuance of a nuisance. The suit was brought against the Philadelphia, Baltimore, & Washington Railroad, the Baltimore & Ohio Railroad, the Pennsylvania Railroad Company, and the Washington Terminal Company, jointly. Without objection, a verdict was directed in favor of the Pennsylvania and the Baltimore & Ohio companies. Over the objection and exception of the plaintiff, verdict also was directed in favor of the Washington Terminal Company. The case against the Philadelphia, Baltimore & Washington Company, hereinafter called the Philadelphia Company, was submitted to the jury and resulted in a judgment in favor of the plaintiff for $4,067.17 damages to the date of suit, from which both parties appeal.

The plaintiff's evidence was in substance as follows: It is a street car company and owns and operates an underground con-

duit system in the city of Washington, including a double-track line on First street, East, between East Capital street and B street, North, under a franchise granted by Congress.

By section 10 of the act of February 12, 1901 (31 Stat. at L. 774, chap. 354), the Baltimore & Ohio Railroad Company was authorized to incorporate the Washington Terminal Company, hereinafter called the terminal company, under the general incorporation act of the District, all of the stock of which corporation to be held by the Baltimore & Ohio Company, the terminal company to have all the authority, rights, and privileges granted by the general incorporation act and by the act of Feb. 12, 1901. The terminal company was incorporated pursuant to this authority.

By the act of February 28, 1903 (32 Stat. at L. 909, chap. 856), the Philadelphia company, "or the terminal company * * * *and each of them,"* were authorized and required to locate, construct, maintain, and operate a double-track underground tunnel along a route prescribed by the act, a part of which tunnel underlies the tracks of the plaintiff on First street, East. A right of election was conferred upon the Philadelphia company to permit the whole or any portion of the tunnel to be constructed and owned by the terminal company, one half of whose stock the Philadelphia company was authorized to acquire from the Baltimore & Ohio Railroad Company. The act further provided that the plans for the construction of the tunnel should be submitted for approval to the commissioners of the District of Columbia, the superintendent of the Library of Congress, and, in so far as public parks and reservations might be affected, to the Secretary of War.

The Philadelphia company did not take advantage of the above right of election, but, on the contrary, undertook the construction of the tunnel through the New York Continental Jewell Filtration Company. This contract provided that from the south side of B street, S. E., to the north side of C street, N. E., including the whole of First street on which the tunnel as authorized underlies the street car tracks of the plaintiff, the tunnel should be constructed as a driven tunnel, its construction

along all other parts of the route to be in "open cut" method. The work was done under a permit as required by law. The permit provided that "the responsibility for any and all expense and damages to person or property directly or indirectly resulting therefrom, due to or connected with the construction, maintenance, or operation of the work, whether done by the railroad company or others in connection with it, to be assumed by the railroad company." The conditions of this permit were accepted by the Philadelphia company in writing. There was nothing on the approved plans which indicated the type of the tunnel which was to be constructed.

The construction of the tunnel was begun in 1904 and completed in the fall of 1906. Trains began to pass through it in the fall of 1907. On October 24, 1907, an agreement was entered into between the Philadelphia company, the Baltimore & Ohio Company, the terminal company, and other railroad companies, reciting that the terminal company *had under construction and would operate and maintain said tunnel,* the contracting railroad companies to have the use of the same at a rental therein provided for, the Philadelphia and Baltimore & Ohio companies as owners of all the capital stock of the terminal company consenting to the arrangement. This agreement further recited that all claims for loss or damages arising from or connected with the administration, operation, and use of the tunnel, and all suits based thereon against any of the parties to the agreement, should be cared for, dealt with, and otherwise disposed of, by the terminal company, the costs and expenses so incurred to be treated and considered as part of the cost and expense of operation.

Originally it was intended to construct the driven portion of the tunnel by what is known as the "shield method," under which the excavation above the masonry of the tunnel would have, been but an inch or two, making impossible any appreciable settlement of the street surface. In consequence of finding a normal quantity of water in Capitol Hill, the Philadelphia company decided to waterproof the masonry roof or arches of the tunnel, and, in order to give the men room in which to do

this work, the "poling-board method" was substituted for the shield method, the result being that the excavation above the masonry was increased from an inch or 2 to 6 feet. The masonry was 25 feet in height, thus making the total excavation 31 feet in height, by a width of 60 feet, the width of the masonry being 50 feet with 5 feet of working space on either side. The top of the masonry was 35 feet below the surface of the street, leaving 29 feet of earth above the top of the entire excavation. Under the poling-board method, what is known as a "header" is first excavated at the height of the proposed excavation, and two other excavations, known as "drifts," are made at the bottom of the excavation. When the header is excavated boards 3 inches thick, called "poling boards," are driven into the earth horizontally, under which are inserted round timbers about a foot in diameter called "crown bars," and below these is constructed what is known as a timber or segmental arch, the bases of which rest upon the masonry walls built up on either side, over the drifts. When the masonry walls and the segmental arch resting upon them are completed, the "core" or unexcavated earth is taken out and the masonry construction completed. When all this had been done in the present case, and the waterproofing added to the roof of the masonry, about 6 feet intervened between the top of the masonry and the undisturbed surface crust. Substantially half of this space was occupied by the poling boards, crown timbers, and segmental arch, all of course of wood. The interstices between the wooden construction were "backfilled," as was also the 5 feet of working space on either side of the masonry walls. The backfill was composed of the best earth which had been excavated, and this, because of the cramped working space, had to be put in and tamped horizontally, wooden tampers being used where iron ones could not be, and, at times, the tamping had to be done with a wedge or with the hands only. Owing to these conditions, it was not possible to get back more than 80 per cent of the earth which had been taken out, leaving voids as to the residue, in addition to which a settlement of about 2 feet was to be expected from loose earth, but this latter settling would end within a

year ·from the completion of the work.    The poling boards, crown bars, and segmental arch will decay, causing a settlement that will continue until this wooden structure entirely disappears, which probably will not occur until the expiration of from twenty to twenty-five years.

No method of construction is so liable to result in street settlement as the method adopted in this case.    When the shield method was abandoned, the contractor endeavored to have the open-cut method adopted, as under that system the backfill could have been "puddled" and tamped vertically, so that very little settlement of the street surface would have resulted, and none that would not have taken place within a year.    Failing to have this method adopted, the contractor recommended that the earth backfill be "grouted" with concrete.    Had this been done, there would have been a concrete arch over the voids, and there would have been very little, if any, settlement of the street surface.    The superintendent of the Congressional Library warned the Philadelphia company that the method pursued would result in the settlement of the street, and that, in front of the Library Building, backfill with Portland Cement would be required, to which requirement the company acceded.    Similar warning was given by the engineer commissioner of the District, to which warning the company replied that, if there should be any future settlement of the street, "we will have to make it good."    Plaintiff further offered testimony tending to show that the commissioners of the District did not refuse permission to build in open cut, but that the failure to adopt this method was attributable to the railroad company; the correspondence introduced showing that, while the commissioners preferred not to have the work done in open cut because of the shade trees and for the greater convenience of people living along First street, permission would have been granted had the railroad company been able to "justify the necessity" and satisfy the commissioners that it was "good engineering practice."

In the months of December, 1907, and January, 1908, the terminal company, through a contractor by the name of Saxton,

and under a permit from the District of Columbia issued to the Philadelphia company, restored to grade First street between East Capitol and B streets, North, which at that time had settled about a foot and a half. In the fall of 1908, the United States government contemplating the construction of what is known as the "pipe tunnel," extending along the west side of First street from E street, South, to between B and C streets, North, to carry heat to the Congressional Library, the Capitol, House and Senate Buildings, plaintiff caused levels to be taken of First street between East Capitol street and B street, North, which showed that the street surface had again settled from 1 to 2 inches. This settlement continued until, at the time of the trial, it had reached as much as 21 inches. There was evidence "that the trouble could still be cured at any time by grouting the backfill."

After the completion of the pipe tunnel, there was some discussion as to whether the settlement of the street above was due solely to the railroad tunnel. In October representatives of the Philadelphia company and the plaintiff agreed upon three engineers for the purpose of taking levels in the pipe tunnel, which had been constructed in the months of November and December of 1908 through the same character of material as the railroad tunnel, and which at its deepest point was $9\frac{1}{2}$ feet below the surface of the street. The settlement of this tunnel was found to be *wholly along so much of its route as overlay the railroad tunnel.* Thereupon the Philadelphia company for the first time denied any liability for damages occasioned by the sinking of the street, on the ground that it was under no obligation to maintain the street over the tunnel; that the title to the tunnel property was vested solely in the terminal company; and that, upon the completion of the tunnel, having restored First street to grade and reimbursed plaintiff for its expenses up to that date, it had discharged all its obligations.

The evidence for the defendants tended to prove that the method employed in the construction of the tunnel was the proper method of constructing a driven tunnel; that the settlement

over the tunnel was a typical drainage settlement caused by the withdrawal of percolating subsurface water. One of their expert witnesses testified that the lowering of the water probably would extend for the distance of a thousand feet, and that as far as the drainage extended the drying out process of the earth would exist. This witness saw no settlement more than 60 feet from either side of the tunnel, and stated that the angle of repose would be approximately 45 feet, and that any settlement beyond that angle probably would be so small as not to interfere with any structure below. This witness could not reconcile his theory that this was a drainage settlement with the fact that the pipe tunnel settled where it overlay the railroad tunnel, and not elsewhere. The evidence for the defendants further tended to show that the open-cut method was not pursued because the commissioners of the District of Columbia would not allow it, although it appeared that the open-cut method was pursued at other points where conditions were substantially the same as here.

In rebuttal, the plaintiff offered testimony tending to show that a settlement which does not extend beyond the angle of repose is not a drainage settlement at all.; that the shrinkage of the street is due to the digging of the tunnel in accordance with the method used and the method of backfilling employed.

Plaintiff requested the court to instruct the jury that it was entitled to recover if the jury should find that the settlement of its tracks was caused by the construction and maintenance of the tunnel. This instruction was refused and an exception reserved, but the ruling has not been assigned as error here.

*Mr. Frederic D. McKenney* and *Mr. John S. Flannery* for the Philadelphia, Baltimore, & Washington Railroad Company, in their brief cited:

*Ahearn* v. *Melvin,* 21 Pa. Super. Ct. 412 or 462; *Baltimore* v. *Baltimore Trust & Guarantee Co.* 166 U. S. 673, 684; *Baltimore & P. R. Co.* v. *Reaney,* 42 Md. 117;

*Bannon* v. *Pennsylvania R. Co.* 29 Pa. Super. Ct. 231; *Bell
Teleph. Co.* v. *Montreal Street R. Co.* 6 Quebec Q. B. 223;
*Brooklyn El. R. Co.* v. *Brooklyn,* 2 App. Div. 98, 37 N. Y.
Supp. 560; *Chicago, B. & Q. R. Co.* v. *Board of Supervisors,*
182 Fed. 291, 294; *Chicago, B. & Q. R. Co.* v. *Chicago,* 166
U. S. 226; *Chicago, etc. R. R.* v. *Nebraska,* 170 U. S. 57, 74;
*Cincinnati Inclined Plane R. Co.* v. *City & Suburban Teleg.
Asso.* 48 Ohio St. 390; *Commissioners* v. *Wise,* 75 Md. 38;
*Curtis* v. *Butler County,* 24 How. 447, 449; *District of Colum-
bia* v. *Brooke,* 214 U. S. 149; *Gillman* v. *Sheboygan,* 2 Black,
515; *H. R. T. Co.* v. *W. T. & R. Co.* 4 Am. Elec. Cas. 275,
135 N. Y. 393, 407, 17 L.R.A. 675; *Kirby* v. *Railroad Co.*
48 Md. 168; *Larned* v. *Burlington,* 4 Wall. 276; *Loan Asso.*
v. *Topeka,* 20 Wall. 661; *Marble Co.* v. *Worcester,* 4 Gray,
395, 397; *Metropolitan R. Co.* v. *Macfarland,* 20 App. D. C.
421; *Millard* v. *Roberts,* 202 U. S. 434, 437; *Muhlker* v.
*Railroad Co.* 197 U. S. 544; *New Orleans Gas Co.* v. *Louisiana
Light Co.* 115 U. S. 650, 672; *New York Continental Jewell
Filtration Co.* v. *Jones,* 37 App. D. C. 511; *N. Y. & N. E.
R. Co.* v. *Bristol,* 151 U. S. 556, 567, 571; *Olcott* v. *Supervis-
ors,* 16 Wall. 698; *Otoe* v. *Baldwin,* 111 U. S. 15; *Pauley* v.
*Steam Gauge & Lantern Co.* 131 N. Y. 90; *Pennsylvania R.
R. Co.* v. *Jones,* 155 U. S. 333; *Philadelphia, B. & W. R. Co.*
v. *Karr,* 38 App. D. C. 193; *Priest* v. *Nichols,* 116 Mass. 401;
*Railroad Co.* v. *Otoe County,* 16 Wall. 673; *Railroad Co.* v.
*Patton,* 179 U. S. 659; *Richards* v. *Washington Terminal Co.*
233 U. S. 546; *Rogers* v. *Burlington,* 3 Wall. 665; *Searles* v.
*Manhattan R. Co.* 101 N. Y. 661; *St. Joseph* v. *Rogers,* 16
Wall. 663; *Taylor* v. *Yonkers,* 105 N. Y. 202; *Pine Grove
Twp.* v. *Talcott,* 19 Wall. 676; *Tyler* v. *Railroad Co.* 18 App.
D. C. 31; *United States* v. *Railroad Co.* 17 Wall. 330; *Wabash
R. R. Co.* v. *Defiance,* 167 U. S. 88, 98; *Wight* v. *Davidson,*
181 U. S. 371, 381; *Wilson* v. *Lambert,* 168 U. S. 611; *Yaggle*
v. *Allen,* 24 App. Div. 594; Baldwin, American Railroad Law,
164; Jones, Easements, §§ 831, 833; Nellis, Street Surface
Railroads, § 7, pp. 286, 287.

*Mr. George E. Hamilton, Mr. John J. Hamilton,* and *Mr. John W. Yerkes,* for the Washington Terminal Company, in their brief cited:

*Philadelphia, B. & W. R. Co.* v. *Karr,* 38 App. D. C. 193; *Philadelphia & R. R. Co.* v. *Smith,* 64 Fed. 679; *State* v. *Rankin,* 3 S. C. N. S. 438; *Chipman* v. *Palmer,* 77 N. Y. 51; *Keys* v. *Gold Co.* 53 Cal. 724.

*Mr. J. J. Darlington,* for the Washington Railway & Electric Company, in his brief cited:

*B. & P. R. R. Co.* v. *Reaney,* 42 Md. 117; *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 5; *Carmody* v. *Capital Traction Co.* 43 W. L. R. 168, 169; *Curry* v. *District of Columbia,* 14 App. D. C. 438, 439; *Kirby* v. *Railroad Co.* 48 Md. 168; *Macfarland* v. *Daly,* 28 App. D. C. 552, 560; *McDermott* v. *Severe,* 202 U. S. 600, 25 App. D. C. 276; *Manning* v. *C. & P. Tel. Co.* 28 W. L. R. 99, 100; *Millard* v. *Roberts,* 202 U. S. 434, 437, 25 App. D. C. 221; *P. B. & W. R. Co.* v. *Karr,* 38 App. D. C. 204, 205; *Pumpelly* v. *Green Bay & M. Canal Co.* 13 Wall. 166; *Walker Furniture Co.* v. *Dyson,* 32 App. D. C. 90, 92; *Washington & O. D. R. Co.* v. *Slyder,* 22 W. L. R. 20, 25; *Wright* v. *Davidson,* 181 U. S. 371, 384.

Mr. Justice ROBB delivered the opinion of the Court:

We will consider now the assignments of error of the Philadelphia company, the first of which is that the court erred in refusing to direct a verdict for it, "upon the pleadings and all the evidence in the case." The contention of this defendant is that while the plaintiff's franchise was the older it was not the superior, and that neither grantee was bound to save the other harmless from the inevitable consequences of the exercise of its privileges or the unavoidable results of interfering with or putting into play the latent forces of nature. It is further con-

tended that there was not sufficient evidence to sustain the allegation in the declaration of the negligent and unskilful digging of the tunnel.

This tunnel was authorized to be constructed under a public street in the heart of the city, adjacent to the Capitol buildings. The surface of that street was in part lawfully occupied by the plaintiff's tracks. That the municipal government possesses power to change, grade, or improve this street, without liability to the plaintiff for the unavoidable injury done, is not denied. *Kirby* v. *Citizens' R. Co.* 48 Md. 168, 30 Am. Rep. 455. "But," as was said by Mr. Justice Van Orsdel in *Philadelphia, B. & W. R. Co.* v. *Karr,* 38 App. D. C. 193, L.R.A. —, —, "the case before us presents a very different situation. Defendant owns no interest in the street. The tunnel was not constructed to improve the highway for public use. It was purely a private enterprise for private use and profit. An improvement of a street by the city is the work of the city itself, for the benefit of all its inhabitants, while the use of a street by a railroad company, for the carrying on of its private business, is strictly a private use." That was an action at law by the owner of a dwelling house abutting on First street for the destruction of the house resulting from the construction of this same tunnel. Negligence in the construction had been alleged, and the case had been tried upon that theory; but in his instruction to the jury the trial judge ignored the question, and ruled that the railroad company was liable for damage resulting proximately from the construction of the tunnel, irrespective of the question of negligence. The action of the trial court was sustained here, this court ruling that under the doctrine of lateral support the existence of negligence was not essential to the right of recovery, the court saying: "If the tunnel had been carefully and prudently constructed, but the damage had occurred to plaintiff's buildings by reason of the withdrawal of the lateral support in the bed of the street, the case, as to the right of recovery, would not be different."

In the present case the street railway company, while not the owner of property abutting on First street, was the owner of

tracks and equipment on and under the surface of the street, which had been lawfully placed there. We must also take into account, in determining the intent of Congress, the important fact that the tunnel was to be constructed under this public street over which, in addition to the traffic of the street railway company, traffic of all kinds was to pass. Any disturbance of the surface of the street, therefore, would not only affect the property of the street railway company, but necessarily would interfere with the public use of the street itself. Having these conditions in mind, we think it clear that Congress did not intend that the grant of authority to construct this tunnel should be exercised irrespective of the rights of the municipality or of the street railway company. This was expressly ruled in the *Karr Case*, where it was said: "Congress, as guardian of the rights of the public in the use of the highway, either on the surface or under the surface, did not intend to grant to defendant the right to so construct its tunnel as to impair private rights without compensation. The franchise carried with it the liability; and defendant, in accepting the privilege, accepted liability, which could no more be contracted away than could the franchise itself." See also *Cumberland Teleg. & Teleph. Co.* v. *United Electric R. Co.* 93 Tenn. 492, 27 L.R.A. 236, 29 S. W. 104; *Baltimore & P. R. Co.* v. *Reaney,* 42 Md. 117. In reaffirming the view that Congress did not intend such a result, we do not wish to be understood as assenting to the proposition that it possessed power to do so. *Baltimore & P. R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317, 27 L. ed. 739, 2 Sup. Ct. Rep. 719; *Wight* v. *Davidson,* 181 U. S. 371, 45 L. ed. 900, 21 Sup. Ct. Rep. 616; *Richards* v. *Washington Terminal Co.* 233 U. S. 546, 58 L. ed. 1088, L.R.A. 1915A, 887, 34 Sup. Ct. Rep. 654; *Baltimore & P. R. Co.* v. *Reaney, supra.*

Here the case was submitted to the jury upon the theory of negligence in the construction of the tunnel, and the verdict, as we have seen, sustained that theory. Under the view above expressed, we do not think the question of negligence material, and therefore shall not enter upon a discussion of the evidence

bearing upon that point.   The question of negligence not being
material, the allegation of negligence and the offer of proof in
support thereof did not make it so.   Such was the ruling in the
*Karr Case.*   See also *Stokes* v. *Pennsylvania R. Co.* 214 Pa.
415, 63 Atl. 1028; *Humphries* v. *Brogden,* 12 Q. B. 739, 20
L. J. Q. B. N. S. 10, 15 Jur. 124, 17 Eng. Rul. Cas. 407;
*Mosier* v. *Oregon R. & Nav. Co.* 39 Or. 256, 87 Am. St. Rep.
652, 64 Pac. 453.

The next assignment of error necessary to be noticed relates
to the action of the court in modifying an instruction offered by
the defendants, to the effect that if the settlement of the street
resulted from the withdrawal of or interference with subterrane-
an or percolating waters beneath the surface of the street, by
the excavation for the construction of the tunnel, the plaintiff
could not recover, by adding the words, "unless they (the jury)
find that said tunnel was constructed negligently, either in the
selection of the method of construction or in the execution of
such method."   The exception to this modification was general.
It now is claimed that "no evidence had been offered by the
plaintiff below that the withdrawal of waters could have been
stopped by any known system of tunnel construction."   In the
first place, the objection was altogether too general.   *W. T.
Walker Furniture Co.* v. *Dyson,* 32 App. D. C. 90, 19 L.R.A.
(N.S.) 606.   The trial court was entitled to be advised of the
specific grounds of the objection.   The observance of that rule
was especially essential in a case like the present, where such a
volume of testimony had been taken.   However, we do not think
this question at all material.   In *New York Continental Jewell
Filtration Co.* v. *Jones,* 37 App. D. C. 511, 37 L.R.A.(N.S.)
193, it was ruled that there can be no recovery by a landowner
for damages to her land caused by excavating for a tunnel under
an adjacent public street, where the injury, consisting of a set-
tlement of the land and the cracking of the foundations and
walls of a house thereon, was caused by the withdrawal of perco-
lating subsurface water from underneath her premises as the
result of the excavation.   The difference between that case and
this is very clear.   "There are no correlative rights existing

between the proprietors of adjoining lands in reference to the use of the water in the earth, or percolating under its surface." *Chatfield* v. *Wilson,* 28 Vt. 49.    The grant authorizing the construction of this tunnel did not, as we have ruled, authorize any interference with the surface of the street.    It is plain, therefore, that there were correlative rights between those occupying such surface and the grantee of the franchise to construct this tunnel beneath the street.    In *Humphries* v. *Brogden,* 12 Q. B. 739, 17 Eng. Rul. Cas. 407, already cited, plaintiff was the owner of the surface of the ground and defendant of the right to take the subjacent minerals.    Notwithstanding that the jury had found that this right had been exercised carefully and according to the custom of the country, a recovery was permitted for the resulting damage to the owner of the surface.    The court said:  "Where there are separate freeholds from the surface of the land and the minerals belonging to different owners, we are of opinion that the owner of the surface, while unincumbered ·by buildings and in its natural state, is entitled to have it supported by the subjacent mineral strata."    In *Popplewell* v. *Hodkinson,* L. R. 4 Exch. 248, in which the doctrine was recognized that the owner may drain his own land without liability to his neighbor, the court said:  "It may be, indeed, that where one grants land to another for some special purpose, for building purposes for example, then, since according to the old maxim a man cannot derogate from his own grant, the grantor could not do anything whatever with his own land which might have the effect of rendering the land granted less fit for the special purpose in question than it otherwise might have been."    Here there are two grants from the same source.    The senior grantee was ·occupying the surface of the street under the terms of its grant when the junior grant was made.    Can it be that Congress intended to clothe the junior grantee with power directly or indirectly to encroach upon or impair the rights or property of the original grantee?    The terms of the junior grant disclose no such purpose.    Why should one public service corporation be injured for the benefit of another?    And yet, if we interpret the statute authorizing the construction of this tunnel as relieving

the beneficiaries of that grant of liability for any damages incidentally resulting to the holder of the original grant, such must be the result.

The further contention is made by this appellant that it ought not to respond in damages, because the evidence shows that, immediately after the completion of the tunnel, it was turned over to the terminal company, which company has since operated it.  So thoroughly is the rule established that he who erects a nuisance continues liable as long as the nuisance continues, that it is unnecessary to dwell upon this contention.  *Plumer* v. *Harper,* 3 N. H. 88, 14 Am. Dec. 333; *Grady* v. *Wolsner,* 46 Ala. 381, 7 Am. Rep. 593; *East Jersey Water Co.* v. *Bigelow,* 60 N. J. L. 201, 38 Atl. 631.  In the case last cited the court said: "The ground upon which the alienor is held liable for a nuisance created by him is that he is the author of the original wrong, and transferring the premises with the original wrong still existing is treated as affirming the continuance of it."

We will consider next the assignment of error of the electric railway company.  That company complains of the action of the trial court in rejecting its prayer that it be permitted to recover in this action for all damages, present and future, and in restricting recovery to such damages as had been sustained up to the time of the institution of the suit.  This assignment is not seriously insisted upon.  We are clearly of opinion that the trial court's view was correct.  In the first place, the company's license to use the surface of the street may be revoked by Congress, or the company may be required to change the location of its tracks.  Then again, unlike the situation in the *Karr Case,* 38 App. D. C. 193, L.R.A. —, —, it would be impossible at this time accurately to determine the extent of future damage.  In addition to these considerations, it is possible that the defects causing the damage may be cured and further trouble averted.

This brings us to the review of the action of the trial court in directing a verdict for the terminal company.  That company was incorporated under the act of February 12, 1901 (31 Stat. at L. 774, chap. 354), "for the purpose of constructing

and owning the terminals, viaducts, railroads, depots, stations, and other works" authorized by the act. Two years later was passed the act (32 Stat. at L. 909, chap. 856) directing the Philadelphia company or the terminal company, and each of them, to undertake the work authorized by the prior act. In the last paragraph of section 1 of the later act, as previously pointed out, the Philadelphia company was authorized to permit the whole or a part of the work south of a designated point, including this tunnel, to be solely constructed and owned by the terminal Company, in which event the Philadelphia company was required to purchase one half the capital stock of the terminal company. This right of election was not exercised, although upon the completion of the tunnel it was turned over to the terminal company, the Philadelphia company then having acquired one half of its stock. The agreement entered into at the time between the Philadelphia company, the Baltimore & Ohio Railroad Company, and the terminal company, recited that the "terminal company *had under construction and would operate and maintain* a railroad and appurtenances," including this tunnel. It will be observed that no right of election was given the terminal company under said act of 1903, so that unless the Philadelphia company should take advantage of the privilege of election, the construction was to be a joint undertaking. The question is presented, therefore, whether the terminal company, jointly charged by Congress with responsibility for the construction of this tunnel, which it was to operate and control when completed, and which it did so operate and control under a written agreement reciting that it *had participated* in the construction and now assumed exclusive control thereof, may escape liability for damages resulting from such construction upon the theory that it did not participate therein. It seems to us that the question answers itself. Neither of the companies jointly interested in the construction of this tunnel could accept the benefits conferred by the statute without incurring the resulting obligations. Just why the Philadelphia company was empowered to act with the terminal company is

not clear, but it is clear from a reading of this and the earlier act that the terminal company was to take charge of, manage, and control the tunnel when completed. The agreement under which the intent of the statute was carried out, therefore, is merely a recognition of that intent. It would be a startling proposition that the terminal company, the real beneficiary of this construction, could, by disregarding its plain duty, escape responsibility for resulting damages. The time or date of the taking of possession by the terminal company does not measure its responsibility; that was fixed by Congress and attached with the acceptance of the authority granted. We rule that the terminal company was as much responsible for the damages resulting from the construction of the tunnel as was the Philadelphia company.

The judgment against the Philadelphia company is affirmed, with costs. The judgment for the terminal company is reversed, with costs, and the cause remanded.

*Affirmed in part and reversed in part.*